UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.L.,<br><br>        Plaintiff,<br><br>   v.<br><br>HARTFORD LIFE AND ACCIDENT<br>INSURANCE COMPANY,<br><br>        Defendant. | Case No.  22-cv-00050-PCP<br><br>**ORDER GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>JUDGMENT, DENYING<br>DEFENDANT'S MOTION FOR<br>JUDGMENT, & DENYING<br>PLAINTIFF'S MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 31, 34, 35 |

Plaintiff E.L. brings this action against Hartford Life and Accident Insurance Company (Hartford) pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132(a)(1) and (3). E.L. challenges Hartford's denial of "own occupation" Long Term Disability (LTD) benefits under a Hartford group long term disability plan. Before the Court are cross-motions for judgment under Federal Rule of Civil Procedure 52. Dkt. Nos. 31, 34. Before the Court is also E.L.'s motion to strike a declaration submitted by Hartford in support of its motion. Dkt. No. 35. For the following reasons, the Court grants E.L.'s motion for judgment in part, denies Hartford's motion for judgment, and denies E.L.'s motion to strike.

## LEGAL STANDARD

ERISA provides claimants with a federal cause of action to recover benefits due under an ERISA plan. *See* 29 U.S.C. § 1132(a)(1)(B). In resolving ERISA claims on cross motions for judgment under Federal Rule of Civil Procedure 52, "the Court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." *McCulloch v. Hartford Life & Accident Ins. Co.*, No. 19-CV-07716-SI, 2020 WL 7711257, at *7 (N.D. Cal. Dec. 29, 2020) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084,

1  1094–95 (9th Cir. 1999)). "In an action tried on the facts without a jury or with an advisory jury, the

2  court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).

3  **FINDINGS OF FACT[1]**

4      **A.**    **E.L.'s Employment History**

5      Plaintiff E.L. is a resident of Campbell, California. Beginning in 2016, she was employed

6  by Boston Scientific Corporation as a Capital Equipment Manufacturing Technician I, a "light"

7  occupation. AR 18–19, 353, 894–95, 1546. In that role, E.L. was required to "perform a variety of

8  routine tasks to ensure production quality standards are met" including, among other duties,

9  performing "the setup of equipment, fixtures, components, cables, etc. for test," "some mechanical

10  assemblies," and "hand setups for AC and digital tests." *Id.* at 894–95. E.L.'s last day of work was

11  February 16, 2020. *Id.* at 340.

12      **B.**    **The Plan**

13      Hartford is an insurance plan provider for Boston Scientific Corporation. Hartford issues

14  long term disability (LTD) benefits under the Group Long Term Disability Plan for Boston

15  Scientific Corporation employees. The Policy Number is GLT-803815. AR 1650. Hartford both

16  issues the Plan and determines whether a claimant is disabled under the terms of the Plan. *See id.*

17  at 1650, 1659–67.

18      The Plan defines "Disability" as a condition resulting from accidental bodily injury,

19  sickness, mental illness, substance abuse, or pregnancy that prevents a claimant from "performing

20  one or more of the "Essential Duties" of "Your Occupation during the Elimination Period," and

21  "Your Occupation, for the 24 months following the Elimination Period, and as a result of Your

22  Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings." *Id.* at

23  1664. After that 24-month period, the claimant must be unable to perform the "Essential Duties"

24  of "Any Occupation" to be considered disabled. *Id.*

25      The Plan defines "Essential Duty" as a duty that is (1) "substantial, not incidental," (2)

26

27  ───────────────

28  [1] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed Conclusions of Law.

United States District Court<br/>Northern District of California

"fundamental or inherent to the occupation; and (3) "cannot be reasonably omitted or changed." *Id*. The Plan explicitly states that a claimant's "ability to work the number of hours" in their "regularly scheduled workweek is an Essential Duty." *Id*.

The Plan defines "Your Occupation" as "Your Occupation as it is recognized in the general workplace." *Id.* at 1667. That definition "does not mean the specific job" the claimant is "performing for a specific employer or at a specific location." *Id*.

The Plan defines "Elimination Period" as "the longer of the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable or the expiration of any Employer sponsored short term disability benefits or salary continuation program, excluding benefits required by state law." *Id.* at 1664. The Plan provides for a 180-day Elimination Period. *Id.* at 1652.

The Plan defines "Mental Illness" as "a mental disorder as listed in the current version of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association." *Id.* at 1665. Under the Plan, a "Mental Illness may be caused by biological factors or result in physical symptoms or manifestations." *Id.* Excluded from the definition of mental illness under the Policy are the following six disorders in the Diagnostic and Statistical Manual: (1) "Mental Retardation;" (2) "Pervasive Developmental Disorders;" (3) "Motor Skills Disorder;" (4) "Substance-Related Disorders;" (5) "Delirium, Dementia, and Amnesic and Other Cognitive Disorders;" and (6) "Narcolepsy and Sleep Disorders related to a General Medical Condition." *Id*.

The Plan generally requires claimants to provide "written notice of a claim within 30 days after Disability or loss occurs." *Id.* at 1659. "[W]ithin 15 days of receiving a Notice of Claim," Hartford is required to send the claimant forms to provide "Proof of Loss." *Id.* If Hartford fails to do so within that time, claimants "may submit any other written proof which fully describes the nature and extent" of the claim. *Id.* "Proof of Loss" may include but is not limited to the date the disability began; the cause of disability; the prognosis; earning statements; evidence of regular care by a physician; "any and all medication information;" the names and addresses of relevant medical providers, facilities, and pharmacies; signed authorizations for release of information; proof of application for other income benefits; and disclosure of "all information and

3

1    documentation required by" Hartford. *Id.* at 1659–60.

2          The Plan entitles Hartford to "Additional Proof of Loss," which includes the right to

3    require the claimant to "meet and interview with …[its] representative;" and "be examined by a

4    Physician, vocational expert, functional expert, or other medical or vocational professional" of its

5    choice. *Id.* at 1660. Hartford "may deny, suspend or terminate" benefits if the claimant refuses to

6    submit to examination or be interviewed. *Id.*

7          The Plan also includes, in relevant part, the following provision for California claimants

8    only:

9          We, and not Your Employer or plan administrator, have the
10         responsibility to fairly, thoroughly, objectively and timely investigate,
           evaluate and determine Your eligibility or Your beneficiaries for
11         benefits for any claim You or Your beneficiaries make on The Policy.
           We will:

12         1) obtain with Your cooperation and authorization if required by law,
13         only such information that is necessary to evaluate Your claim and
           decide whether to accept or deny Your claim for benefits. We may
14         obtain this information from Your Notice of Claim, submitted proofs
           of loss, statements, or other materials provided by You or others on
15         Your behalf; or, at Our expense We may obtain necessary information,
           or have You physically examined when and as often as We may
16         reasonably require while the claim is pending. In addition, and at Your
           option and at Your expense, You may provide Us and We will consider
17         any other information, including but not limited to, reports from a
           Physician or other expert of Your choice. You should provide Us with
18         all information that You want Us to consider regarding Your claim;
           2) as part of Our routine operations, We will apply the terms of The
19         Policy for making decisions, including decisions on eligibility, receipt
           of benefits and claims, or explaining policies, procedures and
20         processes; … [and] 4) if We deny Your claim, We will explain in
           writing to You or Your beneficiaries the basis for an adverse
21         determination in accordance with The Policy as described in the
           provision entitled **Claim Denial.**

22   *Id.* at 1639–40.

23         **C.    E.L.'s Medical History[2]**

24         Health records from early 2020 show that E.L. was at that time diagnosed with

25   "Adjustment Disorder w Mixed Anxiety and Depressed Mood," AR 43, 44, 57, as well as "Major

26

27   _____
     [2] The medical history described herein is taken from the Administrative Record that Hartford
     attached as Exhibit A to the Declaration of Carol Dekshenieks. *See* Dkt. No. 34-2. Because
28   Hartford reviewed and relied upon this record in making its determination, *see* Dkt. No. 34-1 ¶¶ 6–
     7, its contents are properly considered as part of this Court's de novo review of that determination.

Depressive Disorder, Recurrent Episode, Moderate W Psychotic Features" and 'Generalized Anxiety Disorder," *id.* at 50, 51, 53, 57 (repeating diagnoses). Her psychiatric symptoms included severe depression, severe anxiety, difficulty focusing, irrational fears, feeling "sleepy," anhedonia, low energy, paranoia, and dysphoria. *Id.* at 39, 41, 47, 51, 57. In January 2020, she engaged in intensive outpatient (IOP) treatment that included group psychotherapy and medication management. *See id.* at 50–100. She was prescribed psychiatric medications including Abilify and Cymbalta (duloxetine) that had side effects of "nausea, dizziness, and weakness," sleepiness, and headaches. *Id.* at 43–44, 51, 57, 79, 86. Dr. Srimathi Venkataraman placed E.L. "off work from 2/11/2020 through 2/16/2020." *Id.* at 162. In that work status report, Dr. Venkataraman restricted E.L. to working "not more than 4 hours a day for 5 days a week for a maximum of 20 hrs a week," between February 17, 2020 and March 9, 2020, estimating that E.L. would be able to return to work at full capacity on March 10, 2020. *Id.* Dr. Venkataraman later changed her prognosis and in a new work status report placed E.L. on "modified activity at work and at home from 3/10/2020 through 3/24/2020" and estimated that she would be "able to return to work at full capacity on 3/25/2020." *Id.* at 161.

Dr. Brian Poeu Lee, a neurologist with Kaiser Permanente, evaluated E.L. on March 17, 2020 "for a neurologic opinion regarding falling." *Id.* at 108, 113. Dr. Lee diagnosed E.L. with "cervical disc herniation w myelopathy M50.00." *Id.* at 113, 116. Dr. Lee reported that E.L. was "experiencing myelopathic symptoms as a result of C5/6 disc compression upon the cord" that is "position-dependent." *Id.* at 114. He explained that "[f]lexion, extension, or rotation will bring about loss of proprioception and clinical truncal ataxia. The disc visible on C-spine MRI can exert pressure on the cord in these non-neutral positions and cause symptoms during the time that the position is held. That this occurs in both sitting and standing positions is also consistent with a cervical cord localization, rather than a thoracic or peripheral localization." *Id.* at 114. Dr. Lee consequently made a surgical referral. *Id.* at 115. Dr. Lee also documented and "confirmed the presence of" the following clinical diagnoses:

> PPD POSITIVE
> ALLERGIC RHINITIS
> MAJOR DEPRESSIVE DISORDER, RECURRENT EPISODE

1  GENERALIZED ANXIETY DISORDER
   SLEEP APNEA
2  DM 2
   DM 2 W HYPERLIPIDEMIA
3  FEMALE GENITAL ORGAN PROLAPSE
   PITUITARY MACROADENOMA
4  HEADACHE
   DEVIATED NASAL SEPTUM
5  SJORGENS SYNDROME
   ACROMEGALY

*Id.* Dr. Lee signed a work status report and placed E.L. "off work from 3/17/2020 through 6/17/2020." *Id.* at 158, 163. On May 12, 2020, Dr. Lee made a referral to Shalini Goyal, P.T., a physical therapist with Kaiser Permanente, for physical therapy based on a "thoracic sprain/strain" diagnosis. *Id.* at 119. On June 16, 2020, Dr. Lee signed another work status report recommending E.L. remain off work through June 30, 2020. *Id.* at 394.

A physical therapy plan of care was established for E.L. on May 18, 2020, setting out a twelve-week treatment protocol that included weekly physical therapy appointments. *See id.* at 119–20. "[D]ue to COVID19," these appointments were conducted virtually and not in person. *See id.* at 121. Her treatment goals were to "turn head without symptoms," "stand without feeling of being unbalanced," and "be independent with final home exercise program" by the end of the twelve weeks. *Id.* By the third visit, the physical therapist reported that E.L. was still experiencing the "same symptoms" and "doesn't feel balanced when she is standing" despite feeling balanced when walking. *Id.* at 120. "Turning neck" and "raising arms overhead" were aggravating factors. *Id.* On June 29, 2020, the fourth physical therapy visit, E.L. made some improvements and "tolerated new progressions well" but "[c]ontinued loss of balance in standing position with cervical rotation." *Id.* at 123–24.

In a progress note that same day, Dr. Lee wrote: "[E.L.] and I spoke today regarding her continued cervical symptoms and the degree of improvement with physical therapy that is ongoing. Continue with physical therapy and remain off work." *Id.* at 126. Dr. Lee extended his recommendation that E.L. remain off work due to "[u]ncontrolled symptoms" and signed another work status report placing her off work from July 1, 2020 through August 31, 2020. *Id.* at 405.

In a July 31, 2020 Attending Physician Statement for Hartford, Dr. Lee reported that "all activities that include neck flexion, extension, or rotation" impair E.L.'s work functioning. *Id.* at

102. He further certified that he had recommended E.L. stop working effective March 17, 2020 and reported that E.L.'s return to work was "dependent upon surgical or rehab assessment." *Id.*

In a progress note from August 31, 2020, reflecting the eighth physical therapy visit, Physical Therapist Goyal reported that E.L. "reports feeling unbalanced with looking up and down still" and "only 'little bit' unbalanced in standing now." *Id.* at 797. At that point, E.L. had met one of three treatment goals. She was able to turn her head without symptoms and made progress in standing without feeling unbalanced. *Id.* 798. E.L.'s shoulder range of motion was within normal limits, as well as her cervical range of motion "except cervical rotation limited 50% approximately right > left." *Id.* at 797.

E.L. spoke to Dr. Lee that same day by phone. Dr. Lee noted that E.L. has experienced "[l]ess falling" and that physical therapy is helping but reported that "bending still makes falling more likely" and that E.L. needs "to work on balance and posture." He also noted that E.L. had back pain and "hand weakness, particularly left side." *Id.* at 790–91. As a result, he opined that E.L. "[w]ill need more physical therapy and more time off work." *Id.* at 790. Dr. Lee signed a work status report recommending she remain off work through November 1, 2020. *Id.* at 803.

E.L. had another physical therapy appointment on September 21, 2020. The progress note indicated that E.L. was tolerating home exercises well and she showed "[i]mprovement … in cervical range of motion." *Id.* at 804–06. At that point, E.L. had still only met one treatment goal with "[p]rogress made" towards the second of standing without feeling unbalanced. *Id.* at 806. On October 12, 2020, physical therapy progress notes continued to indicate that E.L. demonstrated "progress made" on the second goal of standing without feeling unbalanced but had still not met that goal. *See id.* at 814–16.

On October 27, 2020, Dr. Lee filled out another Attending Physician Statement indicating that E.L. was still unable to work and estimating that that E.L. could return to work by November 2, 2020. *Id.* at 765. On October 30, 2020, Dr. Lee signed a work status report directing that E.L. "is placed off work from 11/2/2020 through 1/4/2021." *Id.* at 841.

On November 2, 2020, E.L. underwent an MRI of her brain with contrast (stealth protocol). *Id.* at 972. The MRI showed "a lobulated expansile sellar/suprasellar enhancing lesion

measuring about 2.4 cm AP by 2.2 cm transverse by 3.6 cm craniocaudal." *Id.* According to Dr.

Michael Jordan Duh of Kaiser Permanente, the impression was of a "[l]obulated expansile

sellar/suprasellar enhancing lesion … suspicious for a macroadenoma." *Id.*

That same day, E.L. was seen by Dr. Allen Efron, a neurosurgeon with Kaiser Permanente,

for a preoperative exam related to her diagnoses of pituitary macroadenoma and acromegaly. *Id.* at

843, 850. He observed that E.L. "was diagnosed with a pituitary tumor on MRI in 2016 done for

tremor evaluation at SCVMC. Hormonal testing revealed elevation of IGF-1. The patient was

offered surgery but her insurance status changed. She is now a KP member and was referred to Dr.

Khan of Endocrinology who noted IGF-1 574." *Id.* at 850.

Dr. Efron reported that E.L. presented with "pituitary macroadenoma causing acromegaly"

and noted "classic symptoms of hand and foot enlargement, sleep apnea, carpel tunnel syndrome,

and dental malocclusion." *Id.* at 850–51. At that time, E.L.'s medications included 1,000 mg

metFORMIN (Glucophage), "HumuLIN N NPH U-100 Insulin 100 unit/mL SubQ Susp," and 20

mg DULoxetine (Cymbalta). *Id.* at 851. The MRI showed a "36mm enhancing mass with

suprasellar and left cavernous sinus extension, some encasement of left ICA. There is contact with

the optic chiasm. The mass appears larger than on prior imaging." *Id.* at 855. Dr. Efron opined:

> Acromegaly due to 36mm pituitary tumor. The size of the tumor also
> poses risks to the optic nerves. I am therefore recommending surgery
> to decompress optic nerves and attempt to normalize hormones. Due
> to the invasive nature of the tumor, curative resection will be unlikely.
> Therefore, adjuvant medical therapy and/or radiotherapy will likely
> be needed.
>
> I discussed surgery in detail including rationale, technique, outcomes,
> risks, benefits and alternatives. I also discussed risks to the patient
> without treatment including, but not limited to, vision loss,
> progressive acromegaly, worsening of diabetes and potential heart
> disease.

*Id.* E.L. consented to "elective admission for stereotaxic transsphenoidal resection of pituitary

macroadenoma." *Id.* at 856.

On November 3, 2020, E.L. had another virtual physical therapy appointment. Physical

Therapist Goyal noted that E.L. reported "doing better" and feeling more balanced. *Id.* at 937–38.

Physical Therapist Goyal's assessment confirmed that E.L. "has demonstrated good progress and

United States District Court
Northern District of California

demonstrates more balance/stability with standing." *Id.* at 939. The second and third treatment goals, however, were still unmet. *Id.* The recommendation was for E.L. to continue her home exercises and pause physical therapy appointments until after her surgery scheduled for November 23, 2020. *Id.* at 938–39.

On November 23, 2020, E.L. was admitted to the hospital and underwent a craniotomy transsphenoidal microscopic tumor excision to remove her tumor. *Id*. at 899–900. She was discharged the next day. *Id.* at 899. Dr. Allen Efron reported that the "[s]urgery and post-op course were uneventful with no evidence of DI or CSF rhinorrhea. By discharge, the patient was ambulating independently, tolerating PO intake, exhibiting satisfactory wound healing, neurologically intact, and voiding well." *Id.* at 900. Dr. Efron placed E.L. off of work from November 23, 2020 through January 4, 2021. *Id.* at 1023.

On January 4, 2021, six weeks after her surgery, E.L. had a follow-up telephone appointment with Dr. Lee. His progress note indicated that E.L. exhibited the following symptoms:

> Headache behind the eyes and around the forehead. Photophobia a component. Focusing can worsen the disequilibrium. No phonophobia.

> Upper and lower extremities seem weaker, particularly when standing up to walk.

> Burning on the hands and feet, most of the time.

*Id.* at 994. Later that day, E.L. had a phone call with her physical therapist. The progress note indicates that a new physical therapy referral was needed because of the recent surgery. Physical Therapist Goyal had sent out two emails requesting new referrals in December and encouraged E.L. to follow up. *Id.* at 945.

Dr. Lee made a new physical therapy referral on January 11, 2021 with a referring diagnosis of "55F with myelopathy." *Id.* at 947. A new plan of care was established on January 20, 2021, and E.L. resumed physical therapy that day. *Id.* Physical Therapist Goyal's progress note listed three new treatment goals:

> Patient will have painfree lumbar range of motion in 8 weeks.

United States District Court
Northern District of California

> Patient will walk community distances without lower extremity muscle fatigue in 12 weeks.
> Patient will be independent with final home exercise program in 12 weeks.

*Id*. at 947–48. During that first appointment, E.L. reported "feeling continued weakness s/p surgery" and "bilateral leg and arm weakness and neck pain. Walks 30 min but states she walks very slow because legs get tired." *Id.* at 948. Physical Therapist Goyal's "objective" assessment indicated that E.L.'s cervical range of motion and shoulder range of motion were "within normal limits." *Id.* at 948–49. E.L.'s lumbar range of motion was also "within normal limits but pain with flexion and left sidebending." *Id.* at 949. E.L. was able to perform "bridging" and maintain a single limb balance for approximately 4 seconds bilaterally. *Id.* E.L. reported weakness "left > right" during squats. *Id.* PT Goyal's assessment was that E.L. "has increased muscle weakness s/p surgery" and the plan was to "progress strengthening and balancing exercises as tolerated." *Id.*

On February 2, 2021, E.L. attended another virtual physical therapy visit and reported that she "[c]ontinued feeling of weakness and decreased balance. States the last two weeks were hard due to feeling other medical issues that she has been in contact with doctors about." *Id.* at 951. E.L. reported completing her home exercises two times per day. *Id.* Physical Therapist Goyal reported that E.L. had "decreased cadence, widened base of support," had pain "with left rotation in sitting not in supine" during cervical range of motion, and had right sidebending pain in addition to left sidebending pain with lumbar range of motion. *Id.* at 951–52. E.L. also had knee pain with squats. Her shoulder range of motion remained within normal limits. *Id.* at 952.

Also on February 2, 2021, E.L. had an appointment with Dr. Yen Hoang Ngo, an ophthalmologist with Kaiser Permanente, to evaluate E.L. for post-surgery symptoms. *See id.* 975–79. E.L. reported that "after surgery, both eyes are very light sensitive, eyes feel tired, [w]hen she looks to the left or right, … has a headache, feels dizzy and wants to fall" but noted that "dizziness" and falling "every time I bend my neck" were symptoms that existed prior to surgery. *Id.* at 976. Dr. Ngo's assessment revealed "[n]o acute ocular findings to account for symptoms of disequilibrium" and indicated that E.L.'s symptoms "are more gazed evoked." *Id.* at 978. Dr. Ngo "quer[ied] if better MRI imaging to area MLF/midbrain would be worthwhile to further evaluate any pathology that would be consistent with sxs," and planned to "cc note to Neuro-

ophthalmologist, Dr. Hwang for further review." *Id.* Dr. Ngo recommended follow-ups with "Dr. Lee for further w/u of disequilibrium" and "with endocrinology, Dr. Ka[h]n." *Id.*

On February 8, 2021, E.L. underwent an echocardiogram to evaluate causes of shortness of breath. *Id.* at 1209. Dr. Shailan Shah of Kaiser Permanente interpreted the results. The findings showed that E.L.'s results were largely normal with "[m]ild mitral regurgitation," "[m]ild aortic regurgitation," and "[m]ild left atrial enlargement." *Id.* at 1210–12.

On February 9, 2021, E.L. had a follow-up neurology appointment with Dr. Lee. *Id.* at 705. Records indicate that Dr. Lee performed a "[d]etailed neurologic examination" to evaluate the following symptoms: "[h]ands and feet burning paranesthesias. Perhaps involuntary movement. Eyes feel like they want to close, all the time. Looking at the right, her head tends to tilt toward that side, with the neck giving way. Same on the left. Eyes more tired with lights. Balance feels off. Seems worse than before surgical intervention, she observes." *Id.* Dr. Lee's assessment indicated "no additional neurologic disorder at this time" and "no single localization within the neuraxis that will produce E.L.'s current constellation of symptoms." *Id.* at 706. He reported a "discordance between direct and indirect examination. She tilts toward the direction of gaze on EOM testing and during FTN testing. None is present on indirect examination. Gait is affected." *Id.* at 705. He reported "5/5 strength bilaterally in the upper and lower extremities." *Id.*

On March 9, 2021, E.L. had a follow-up appointment with Dr. Lee "reporting persistent symptoms" including "weakness in her lower examinations." *Id.* at 1101. He conducted another detailed neurologic examination that again "shows discordance between direct and indirect examination." *Id.* Dr. Lee's note indicated that E.L. continued to demonstrate "5/5 strength bilaterally in the upper and lower extremities" and that E.L. was "[a]ble to stand from the chair with arms crossed but then sits back down when 80% upright." *Id.* He concluded that there was "no additional neurologic disorder" and did "not see any localization within the neuraxis that would account for E.L.'s constellation of symptoms today." *Id.* at 1102. He recommended that she "[r]eturn to care of primary physician." *Id.*

On March 11, 2021, E.L. had a 60-minute appointment with Dr. Thomas Nyping Hwang, an ophthalmologist with Kaiser Permanente, to address her symptoms of dizziness and light

11

sensitivity. *Id.* at 728–33. Dr. Hwang observed that "[h]eadthrust overall negative but frequent dramatic neck and eye deviations to all sides with whole body jerking" that "didn't happen if eyes closed." *Id.* at 729. Dr. Hwang made the following observation about the appointment:

> PT was fine for 30 minutes during history and looking [at] me but then once I asked her to look right at me she suddenly fell forward out of her chair or she fell to the left side and then was immediately more stable after I helped her sit back down. There was no preceding eye movement. This occurred half a dozen times even when just looking at my finger. In between exams, the patient sat stably without any problem and was stable for another 20 minutes during our wrap up exam[.]
>
> Watched her walk down the hall in between testing and no wide based gait or other issue[.]
>
> She states that it only happens when she is not doing something else but she says it happens often. Like when she's talking to someone it's fine. It doesn't happen when she's looking at the computer or TV[.]

*Id.* at 730. Dr. Hwang concluded that there was "no clear vestibular or ocular misalignment findings on exam" and that "there is no detectable optic nerve damage and … vision was normal." *Id.* at 733. He recommended "updated refraction given her ani[s]ometropia and hyperopia" that "might help her eyes relax." *Id.*

On March 17, 2021, Dr. Nishkala Gutta with Kaiser Permanente called E.L. for a "TAV" regarding her symptoms of dizziness and to provide a second neurology opinion. *Id.* at 713–14. Dr. Gutta's note indicated that she reviewed Dr. Lee's assessment that "[n]o neurologic diagnosis … explains her symptoms. And inconsistent exam and symptoms." *Id.* at 713. Dr. Gutta had discussed with Dr. Lee that the "etiology is unclear" and an "[u]nlikely neurologic issue." *Id.* at 715.

On March 18, 2021, E.L. underwent an MRI of her spinal canal lumbar with contrast at Sunnyvale Imaging Center. *Id.* at 1126–28. The MRI report documented the following impressions:

> 1. L2-L3 moderate-severe degenerative disc disease, right lateral annulus bulging and left posterolateral profusion measuring over 4 mm. There is moderate-severe left foraminal stenosis. There is slight retrolisthesis of L2.
>
> 2. L3-L4 moderate-severe degenerative disc disease, diffuse posterior and lateral annulus bulging measuring 4-5 mm laterally, left side

greater than right. There is mild to moderate right and moderates left foraminal stenosis. There is 2-3 mm retrolisthesis of L3.

3. L5-S1 left lateral annulus bulging and right posterolateral profusion measuring at least 3 mm with severe compression of the S1 nerve in the lateral recess. There is moderate right and mild left foraminal stenosis.

4. L4-L5 disc desiccation, diffuse posterior lateral annulus bulging. The right lateral disc bulge measures over 5 mm combined with endplate bone spurring and arthropathy causing moderate foraminal stenosis. The disc also compresses the existing L5 nerve.

5. L1-L2 left lateral annulus bulging and right posterolateral protrusion measuring at least 4 mm. No foraminal stenosis.

6. Lower thoracic disc desiccation and annulus bulging and arthropathy right side greater than left. There is moderate to severe right T12-L1 and T11-T12 foraminal stenosis. T10-T11 foramina only partially visible with at least moderate foraminal stenosis.

7. Moderate thoracolumbar levescoliosis with the apex of curvature to the left at T11-T12.

*Id*. at 1128.

In a progress note dated March 22, 2021, Dr. Gutta wrote that a "[n]euro consult last week indicated that there is no neurologic focus for her symptoms. similar opinion [from] ophthalmology. when I brought the conversation up, pt got up from her chair, ran across the room and hit her head on the floor. was not arousable after that for 2-3 minutes. Patient transferred to ED for further evaluation for head trauma. Cause for her dizziness is currently unclear. Will get a second neurology opinion." *Id.* at 1100. Dr. Steven Thomas Foy, emergency department doctor with Kaiser Permanente, included a note from an econsult that day by Dr. Gutta in E.L.'s records. It explained: "neuro consult last week indicated that there is no neurologic focus for her symptoms. Similar opinion … [from] ophthalmology. [W]hen I brought the conversation up, pt got up from her chair, ran across the room and hit her head on the floor [and] was not arousable after that for 2-3 minutes. ?conversion disorder vs. malingering. Please evaluate for dizziness and head trauma." *Id.* at 721.

Dr. Foy's initial impressions were: "[c]onsidered intracranial injury, intracranial tumor, postoperative infection, electrolyte abnormalities, dehydration, conversion disorder/malingering." *Id.* at 725. Dr. Foy observed that E.L. did "have a minor head injury today, but she did not actually

United States District Court
Northern District of California

lose consciousness, and does not have any high risk features by the Canadian CT head rule." *Id.* at 727. He recommended "a CT scan of the brain would be indicated" and "discussed this with the patient." *Id.* He reported that E.L. "refuses to have a CT scan done because she is worried about the radiation risk." *Id.* Dr. Foy reported that he explained the low risk involved in a CT scan and further documented that "I have also discussed with her that it is impossible for me to rule out a life-threatening intracranial pathology such as intracranial bleeding, tumor/mass, or other space occupying lesions." *Id.* Dr. Foy reported that E.L. still refused to undergo a CT scan that day. *Id.* Dr. Foy did "not feel that an MRI of the brain would be the appropriate study as it is not a sensitive CT scan for the diagnosis of her acute intracranial hemorrhage, which would be my chief concern today." *Id.* He wrote, "since her symptoms seem to have been chronic and there is no other emergency department evaluation indicated," E.L. was "discharged home per her desire AGAINST MEDICAL ADVICE." *Id.* (emphasis in original).

On March 23, 2021, E.L. underwent an MRI at Sunnyvale Imaging Center. *See id.* at 1129–31. The findings indicated that while her "forearm magnum and skull base appear within normal limits," her "sella is enlarged and very distorted." *Id.* at 1129. Among other findings, the reviewing doctor observed: "[t]here is no visible pituitary tissue or definitive mass. There appear to be changes related to paranasal sinus surgery. There is a circumscribed intermediate T2 mass in the left lobe of the thyroid measuring approximately 2 x 4.3 cm. There are smaller lesions in the right lobe." *Id.* The following impressions were noted:

> 1. C5-C6 degenerative disc disease, grade 1 spondylolisthesis, right paracentral 4 mm disc osteophyte complex contacting the cord without displacement or compression. There is moderate-severe right foraminal stenosis."
> 2. Arthropathy at all remaining cervical and thoracic levels with foraminal narrowing, mild at C3-4 and C4-5, moderate right C6-C7 and bilateral C7-T1.
> 3. Loss of curvature and straightening of the spine.
> 4. Postoperative changes in the sella as described. Evaluation of the sella is limited.
> 5. Bilateral thyroid lesions. The largest mass is in the left lobe measuring over 4 cm. Ultrasound evaluation is recommended.

*Id.* at 1130–31.

On March 31, 2021, E.L. had a neurology consultation with Dr. Edwin Simeon Tasch of

Kaiser Permanente after Dr. Lee requested that he provide a second opinion. *See id.* at 707–10. He reported that E.L.'s "surgery was reported to be uneventful with a small amount of residual tumor left behind. Her growth factor hormones are still somewhat elevated and her endocrinologist, Dr. Kahn, is working on this." *Id.* at 707. He described that during the visit:

> As we talked, I will spontaneously see her close her eyes, she is able to open them when I asked her to. There are occasional sudden jerks of her body in her head, and she will lean backwards. She then corrects herself. When I shine the light in her to do a funduscopic exam initially she will have such a jerk, momentarily, but then I can continue my exam. A similar phenomen[on] happened when I checked her Babinski reflexes.

*Id.* at 708. Dr. Tasch opined that "there is leukocytosis … which appeared to be nonphysiologic in my opinion. Apart from these phenomen[a] her neurologic exam is normal. My opinion she has subclinical functional neurologic disorder/conversion disorder which may be a combination of subjective symptoms from her hormonal fluctuations in combination with psychological stress." *Id.* at 709.

On April 14, 2021, E.L. had an appointment with endocrinologist Dr. Mehreen Malik Kahn of Kaiser Permanente. *See id.* at 1206–08. Dr. Kahn reported that E.L. presented with "weight gain (17 lbs)," "thicker" muscles, "burning in hands and feet," "long standing dry mouth and nocturia," and "cardiomegaly suspected," and "IGF-1 rising." *Id.* at 1206. Dr. Kahn accordingly "favor[ed] starting medical treatment now." *Id.* Dr. Kahn diagnosed E.L. with "[a]cromegaly with residual disease after debulking," *id.* at 1207, for which Dr. Kahn prescribed E.L. 20mg of octreotide, *id.* at 1208.

On April 19, 2021, E.L. had another physical therapy appointment. *See id.* at 1228–30. The note indicates that E.L. was "tolerating home exercise program well" but her progress was "ongoing" as she had not yet met the treatment goals. *Id.* at 1229–30.

On April 26, 2021, E.L. had a telephone Therapeutic Supportive Services (TSS) appointment with Janet Ly, MFT of Kaiser Permanente, who reported that she would be taking over E.L.'s case management. *See id.* at 1222–25. Per Ms. Ly's notes, E.L. "reports ongoing dizziness, eye keeps closing, head shaking. She reports that will be checking with her ophthalmologist, ENT and endocrinology to hopefully try and resolver her sx. She denies that

these physical sx could possibly be related to worrying or stress. She reports that the physical sx occurred after surgery and denies that stress/anxiety are a concern for her at the moment. Reports less energy due to physical sx, sleep (6 hrs/daily) and app (3 meals/day) are the same." *Id.* at 1222–23. The note listed "Major Depressive Disorder, Recurrent Episode Full Remission (primary encounter diagnosis)" and "Generalized Anxiety Disorder" as diagnoses. *Id.* at 1223 (emphasis omitted). Ms. Ly reported E.L's updated treatment goals as "TSS & med management." *Id.*

On April 29, 2021, E.L. had a follow-up appointment with Dr. Gutta for ongoing complaints of "persistent dizziness and visual changes" and "falling several times daily." *Id.* at 716. Per the note, E.L. was able to drive to the appointment and requested a VOT extension. *Id.* Like other providers, Dr. Gutta reported that E.L. "occasionally blinks suddenly and falls/leans to either side. Occasional [j]erking followed by falls." *Id.* at 717. Dr. Gutta recommended that E.L. "follow up with ENT/endocrine." *Id.* at 719. Dr. Gutta opined "Possible conversion disorder. Advised to follow up with psych." *Id.* Dr. Gutta was "unable to provide an extension of her VOT at this time due to absence of a viable neurologic diagnosis" and discussed her impressions with Dr. Venkataraman "who has graciously agreed to evaluate" E.L. *Id.*

On April 30, 2021, E.L. had an appointment with Dr. Joseph Chang of Kaiser Permanente for a "Head and Neck Surgery" follow-up. *Id.* at 1199. Dr. Chang had last seen E.L. on February 10, 2021 for "[a]cute sinusitis resolved after antibiotics" and noted "left epiglottic mucocele." *Id.* Dr. Chang opined that he "[w]ould consider vestibular migraine as a possible etiology although her history of transsphenoidal surgery and pituitary adenoma may [be] contributing to some of her migrainous symptoms including retroorbital pain, photophobia, and difficulty focusing her eyes." *Id.* at 1200. He recommended that E.L. "continue Flonase and nasal saline irrigations" and "defer to PCP and Neurology for consideration of migraine medications." *Id.*

On May 6, 2021, E.L. had a psychiatry follow-up visit with Dr. Venkataraman. *See id.* at 681–86. Dr. Venkataraman noted that "Patient has been worked up by different [specialties] (ophthalmologist, neurologist and ENT) and no organic causes found" for her symptoms of "feeling dizzy, unstable and weak (legs and arms)." *Id.* at 681. E.L. "was referred to psychiatry to rule out psychological causes for the somatic symptoms." *Id.* The note indicated that E.L. reported

16

"[f]eeling stressed because of her physical symptoms" and "clearly indicates that her stress and sadness are mainly related to her physical symptoms." *Id.* Dr. Venkataraman diagnosed E.L. with "major depressive disorder current mild," *id.* at 686, and opined that "Eileen Le is a 55 Y female with stress and depression due to feeling physically unwell (increased somatic symptoms since Nov)." *Id.* Dr. Venkataraman increased Cymbalta to 40 mg at night and increased gabapentin "300 mg to qid (was taking it tid)." *Id.* "Patient was provided 2 weeks time off," *id.*, from May 6, 2021 through May 23, 2021, *id.* at 687.

On May 12, 2021, E.L. had a follow-up neurology appointment with Dr. Tasch. *Id.* at 711. Dr. Tasch noted that E.L. "exhibited balance difficulties and had jerks [that] … continue to appear to be functional in nature." *Id.* at 712. Dr. Tasch "continue[d] to be of the opinion that these symptoms represent a form of conversion disorder" and "messaged her psychiatrist." *Id.*

### D.      LTD Claim History

E.L. applied for and received short term disability (STD) benefits from Hartford from February 17, 2020 through August 16, 2020. *See* AR 277. On October 8, 2020, E.L. submitted an application for LTD benefits. *Id.* at 754–58. On the form, E.L. reported that her first symptom occurred on December 2, 2019 when she fell down at work. *Id.* at 754. She reported that she "fell down at the meeting with my manager and supervisor" and indicated that her "back and neck" are the reasons for her inability to work. *Id.* at 755. She answered "yes" to the question whether her condition is "related to activities or your workplace." *Id.* She wrote "12/02/2019" as the "[l]ast day worked before the disability" and "12/03/2019" next to "[d]ate you were first unable to work." *Id.* She also checked "yes" to the following question: "[i]f you have not returned to work, do you expect to?" She noted that she expected to return to work part time on "11/02/2020." *Id.*

In a letter to E.L. dated October 13, 2020, Hartford Senior Ability Analyst Laurie Lee acknowledged receipt of E.L.'s application for LTD benefits. *See id.* at 1277–78. The letter stated that Hartford needs "[o]ffice visit notes, testing results from ALL treating providers (beyond 6/16/2020 to present)" and that Hartford is "requesting this directly from Kaiser so there's nothing you have to do right now." *Id.* at 1277. The letter proceeded to say that it was E.L.'s "responsibility to confirm the documentation is sent to us by 10/27/2020." *Id.* The file contains a

United States District Court
Northern District of California

letter dated October 14, 2020 from Laurie Lee addressed to "Kaiser Permanente" and a letter dated October 16, 2020 addressed to "Santa Clara Medical Center – Kaiser Permanente" requesting office visit notes, testing, and rehab notes "beyond 6/16/20 to current." *Id.* at 1283, 1286–87.

In a letter to E.L. dated October 28, 2020, Laurie Lee stated that Hartford had not received all the information requested. *See id.* at 1284–86. The letter stated that Hartford needed "[o]ffice visit notes, testing results from ALL treating providers (beyond 6/16/2020 to present) and an "[u]pdated work status note" "**by 11/11/2020**." *Id.* at 1284 (emphasis in original). The letter warned: "**Please make sure we receive the information by 11/11/2020 to avoid having your claim closed. If your claim is closed due to missing information, you may be able to reopen it by sending us the information we need to finish our review.**" *Id.* (emphasis in original).

The file contains a letter dated November 2, 2020 from Laurie Lee addressed to Dr. Brian Poeu Lee again requesting records from 6/16/2020 to the present and asking that he submit those records within "7 business days." *Id.* at 1289–90.

E.L. scheduled an appointment with Hartford's Laurie Lee regarding her claim for 9:30 AM – Eastern on November 4, 2020, which Laurie Lee confirmed by email. *See id.* at 1291–92. On November 4, 2020, Laurie Lee spoke with E.L. on the phone. The note from that call indicate that E.L. reported having neck and back pain and struggling with balance. *Id.* Specifically, the note states that E.L. "[c]ontinues with unbalance when she turn[s] her head left/right," reports that "her hand gets numb (both hands)," and "almost falling." *Id.* E.L. shared that she does "not use a cane, but she cannot stand for a long time." *Id.* Therefore, she "use[s] furniture to get around" and "must lean [her] body on something." *Id.* E.L. did share that she was able to drive. *Id.* According to the note, E.L. also reported that she underwent an MRI and X-Ray. *Id.* While her providers are "talking about surgery," the note states that E.L. "want[s] to try therapy to see if she improves." *Id.* Laurie Lee advised E.L. that Hartford needed records from Kaiser as they had not received a response. *Id.*

That day, Laurie Lee sent E.L. an email requesting office notes and testing from "ALL treating providers (beyond 6/16/2020 to 10/27/2020)," the "[l]ast 3 physical [t]herapy notes," and an "[u]pdated work status note." *Id.* at 1292. Laurie Lee acknowledged receipt of a "Kaiser

18

1   Attending Physician Statement dated 10/27/2020," but noted that "it does not indicate how long

2   the doctor is keeping you out of work or the treatment plan." *Id.*

3        On November 10, 2020, Laurie Lee made a clinical consult referral in E.L.'s file stating:

4            54 year old female employed as a CAPITAL EQUIPMENT
             TECHNICIAN I, sedentary job demand. EE job consist of desk work.
5            EE originally diagnosed with MAJOR DEPRESSIVE DISORDER,
             SINGLE EPISODE, UNSPECIFIED. Based on the medical
6            documents received, the claim was approved thru 3/9/2020. The
             condition was changed from behavioral to medical CERVICAL DISC
7            DISORDER WITH MYELOPATHY, UNSPECIFIED CERVICAL
             REGION ee doing PT (Kaiser).[3]

8

9   *Id.* at 1478.

10       On November 11, 2020, Hartford Medical Case Manager Amy Bergner conducted a

11   clinical consult review of E.L.'s claim. She concluded:

12           The referral is non-actionable. Dr. Lee has indicated no work capacity
             until 11/1/20 but there are no evaluation notes from him with
13           measurable examination findings after 3/17/20. EE has been attending
             PT virtually; the most recent note is dated 7/13/20 and contains scant
14           measurable findings. EE reported feeling a bit better. She was able to
             perform standing punches without any loss of balance. She did require
15           upper extremity use for standing cervical rotation AROM to prevent
             loss of balance. This would not preclude performance of a sedentary
16           PDL job. The information is also 4 months old. The file is being
             returned to AS for further development. Medical records with
17           objective examination findings after 7/13/20 are needed, surgical
             evaluation if done. PM&R records and updated records from Dr. Lee
18           are needed to determine response to treatment and ongoing treatment
             plan, ERTW.

19

20   *Id.*

21       On November 12, 2020, Hartford denied E.L.'s LTD claim by letter. *See id.* at 1293–96.

22   The letter explained:

23           Your Long-Term Disability (LTD) claim wasn't approved because
             the information we received isn't enough to show that you aren't able
24           to work.

25           On November 06, 2020, you submitted the physical therapy notes
             from Kaiser through July 13, 2020. Dr. Lee submitted a work status
26           note dated October 27, 2020, requesting time off until November 1,
             2020.

27

28   _____
     [3] The records regularly refer to E.L. as "EE."

United States District Court
Northern District of California

> The above information was reviewed and determined to be insufficient. There is no current evaluation notes with the measurable examination findings beyond March 17, 2020. Records show that you have been attending physical therapy virtually. Records show that you required upper extremity use (to prevent loss of balance) when performing the standing rotation test.
>
> Based on the above we were unable to determine if you can/cannot perform your own occupation.

*Id.* at 1294. In so concluding, Hartford stated that it relied on the following guidelines:

> **Not Disabled Own Occupation:**
>
> On an ongoing basis during the own occupation period, the Analyst should compare the:
> - Policy definition of Disability;
> - Essential Duties of the occupation; and
> - Medical and vocational information
>
> The Analyst should recommend a claim be denied or terminated when the analysis of all the medical and vocational information indicates that the claimant no longer meets the policy definition of Disability.
>
> **Proof of Loss:**
>
> The Analyst should recommend a claim be terminated or denied when:
>
> - Information was requested from a physician or claimant;
> - Ongoing Disability cannot be determined without the requested information;
> - The claimant is aware of what information is needed; and
> - The information has not been received after at least two (2) follow ups

*Id.* at 1294–95. The denial letter invited E.L. to submit additional information that might alter Hartford's determination. *Id.* at 1294. It provided further:

> Specifically, you should send office visit notes, testing results and physical therapy notes beyond July 13, 2020 to present. Would recommend sending notes from ALL current treating providers (Example: Orthopedic, Pain Management, Primary Care) that information is necessary to understand your full course of treatment; and what your current functional capacity level is to date. If you would like this information considered, we must receive it as soon as possible.

*Id.* The letter also notified E.L. of her right to appeal. *Id.* at 1295.

On November 23, 2020, E.L. sent an email to Hartford submitting clinical records from Dr.

Lee and Physical Therapist Goyal from July through October in support of her application. *See id.*
at 789.

On November 24, 2020, Laurie Lee made another clinical consult referral describing E.L.
as a "54 year old female employed as a capital equipment technician I, sedentary job demand" and
stated that "EE job consist of desk work." *Id.* at 1477 (emphasis removed). She further wrote that
"EE [was] originally diagnosed with Major Depressive Disorder, Single Episode, Unspecified.
Based on the medical documents received, the claim was approved thru 3/9/20. The condition was
changed from behavioral to medical cervical disc disorder with myelopathy, unspecified cervical
region." *Id.* (emphasis removed).

The next day, Medical Case Manager Amy Bergner again reviewed E.L.'s file. *Id.* at 1477.
She closed the claim, concluding:

> Dr. Lee has indicated no work capacity until 1/4/21 but there are no
> evaluation notes from him with measurable examination findings
> after 3/17/20. EE has been attending PT virtually once every 3 weeks;
> the most recent note is dated 10/12/20 and contains scant measurable
> findings. EE reported feeling a bit better. She was able to perform
> standing punches without any loss of balance. She is feeling more
> balanced and had no loss of balance with standing cervical ROM. She
> was demonstrating good progress and felt relief with diaphragmatic
> breathing for the neck and back symptoms. She was to practice arm
> swing with walking. Dr. Lee has not provided restrictions and
> limitations. The claim is closed for proof of loss. MCM and AA
> discussed that the information submitted does not change the
> determination of lack of medical proof of impairment. File is being
> returned to the AA for further handling.

*Id.*

On December 8, 2020, E.L. called Laurie Lee to follow up on an appointment scheduled
for that day. *Id.* at 1476. Per the case note, Laurie Lee informed E.L. that the additional records do
not support her claim. Laurie Lee wrote:

> AA confirmed with ee that her visit[s] with the provider are all
> televisit … Per ee her last visit with Dr Lee was 10/31/20 and was a
> televisit … [and] her last office visit was back in March, 2020. Per ee
> ALL visit[s] at Kaiser are televist during the pandemic. … Per ee she
> did have surgery on 11/23/20 with Dr Efron … [and] ha[d] a tumor[]
> removed from her head. … Per ee she mailed the op report on 12/1/20.
> AA advised we do not have the op report at this time. …EE expressed
> she [i]s sending what she ha[s] and that all the visit[s] even PT [were]
> done [by] televisit. … AA advised she will review her claim again …

> and await the op report from 11/23/20. … Plan: AA will discuss claim with administration as the clinical[s] from Kaiser are [by] televist[.] [T]his is the only type of visit that [is] being done at this time. … would also like to see the op report that ee mailed on 12/1/20[.]

*Id.* That same day, Laurie Lee consulted someone named Lisa Lefkowitz about the claim. *Id.* That claim note indicates that Laurie Lee "advised that ee's visits with the provider and PT are televisit" and that there was "no in person visit for physical exam." *Id.* Laurie Lee also advised that E.L. recently had "a procedure and mailed the report on 12/1/20." *Id.* Hartford's plan was to "allow until next week (7-10 business days) … for clinical to come in" before doing a "walk up with MCM to see if the noted clinical change[s] the prior determination/recommendation." *Id.*

On December 14, 2020, Laurie Lee made another clinical consult referral, again describing E.L.'s job as having a "sedentary job demand" that "consist[ed] of desk work." *Id.* at 1476. The note also again described E.L.'s original diagnosis as "major depressive disorder, single episode, unspecified." *Id.* (emphasis removed). This clinical consult referral added that "EE reports due to COVID 19 all ov went televisit" and that E.L. "was referred to Dr Efron … SX performed 11/23/20, req oow 11/23/20-1/4/20." *Id.*

On December 17, 2020, Hartford Medical Case Manager Elizabeth Bush conducted a clinical consult review. As next steps, she recommended:

> 1.If needed, recommend post -operative OV from Dr. Efron with recent PE findings, complications due to surgery, treatment plans, specific R&L and RTW plans. If further clinical impact is needed, send CCR as per process. 2. Recommend prior to any CCR, updated complete detailed TPC with emphasis on perceived barriers to RTW, current pain/symptoms, treatment plan, response to current treatment, RTW plan, and a DETAILED description of daily activities

*Id.* at 1476.

E.L. had scheduled another appointment with Laurie Lee for January 11, 2021. *See id.* at 1476. Laurie Lee's claim note for that call indicated that E.L. "has no other clinical from Dr. Lee" and mentioned that E.L. "advised due to COVID she did not have in office visit, even her therapy was done [by] televisit." *Id.* Laurie Lee informed E.L. about her right to appeal and "advised ee the time oow from 11/23/20 supports but not from LTD start date of 8/17/20." *Id.*

### E.    E.L.'s Appeal of Her LTD Claim

On January 12, 2020, E.L. appealed Hartford's denial of her LTD claim. *See* AR 918–26.

Along with the disability appeal questionnaire, E.L. also submitted a personal letter, list of providers and appointment dates, and a work status report from Dr. Lee placing her off work due to "uncontrolled symptoms" from January 5, 2021 through March 5, 2021. *Id.* at 920, 924–26. In her letter, E.L. explains that her "illness began" December 2, 2019, when she "fell down at work." *Id.* at 924. She listed the following diagnoses and medications with date of onset for which she is experiencing symptoms and receiving care:

1. DM2 W Hyperlipidema 08/09/2019
2. Female Genital Prolapse 09/04/2019
3. Pituitary Macroadenoma 11/14/2019
4. Headache 12/02/2019
5. Sjorgens Syndrome 12/06/2019
6. Cervical Disc Herniation Myelopathy 03/23/2019
7. Major Depression Disorder 05/28/2020
8. Type 2 Diabetes 06/09/2019

*Id.* She reported that "[t]his is the most burden time of my life. I still have uncontrollable symptom[s] of my body falling. My neck and lower back are so much in pain. I always have my headache. My growth hormone level cause[s] my body, my hands, my feet, my bone [to grow] big and also enlarged my heart. My join[ts] are [in] pain. I often have … shortness of breath." *Id.* In that letter she also explained that her doctors "have been helping and providing medications, treatments and therapy through the phone and video visits" because of the COVID-19 pandemic. She also mentioned the November 23, 2020 surgery and that her doctors recommended "another surgery for …[her] spine." *Id.*

On February 12, 2021, E.L. had a telephone call with Hartford Appeal Specialist Kay Hinsey to discuss her appeal. *See id.* at 1575–79. The contact note says that E.L. "confirmed DCI 2/17/20 initially due to stressful work environment, harassment and abuse resulting in anxiety and depression" that "she continued to treat with a psychiatrist for monthly visits telephonically for medication management." *Id.* at 1578. Those symptoms "are controlled with medication." *Id.* That note states further that E.L. "advised the reason she is unable to RTW at her job as a technician [is] that [it] requires her to sit on [a] bench and build products, she has to walk back and forth, sit/stand, [and] walk [the] factory floor due to cervical disc herniation with myelopathy." *Id.* E.L. described losing balance and falling when moving her neck right and left and bending her neck. *Id.*

23

1   She reported that falls "occur with sitting and standing" but not when walking and shared that she

2   can "still drive but only short distances." *Id.* She explained that her symptoms, including

3   headaches, dizzy spells, and joint pain have worsened since her surgery. *Id.* E.L. asked "for more

4   time to provide the OVNs as of oct. 2020-2/9/21 from Dr. Lee, PT notes as of Oct. 2020-2/10,

5   [and] MRI brain results." *Id.* Kay Hinsey noted that the appeal would be on hold for 30 days. *Id.*

6        According to a letter from Kay Hinsey to E.L. dated February 18, 2021, Hartford received

7   updated records from Kaiser that month:

8              On 02/16/2021 and 02/17/2020 we received the treatment notes from
           Dr. Lee, neurology, date range 08/31/2020 through 02/09/2021, and
9           physical therapy progress notes date range 10/12/2020 through
           02/02/2021. We also received the results from a magnetic resonance
10          imaging (MRI) brain study, dated 11/02/2020, the results from a MRI
           head study, dated 12/27/2020, and the evaluation report of your visit
11          with Dr. Yen Hoang Ngo, ophthalmology, dated 02/02/2021.

12  *Id.* at 1324–25. The letter noted that Hartford "started the appeal review process on 02/18/2021"

13  and aimed to make a determination by "no later than **04/03/2021.**" *Id.* at 1325 (emphasis in

14  original).

15              **1.    Physician Review Report – March 5, 2021**

16       On February 22, 2022, Kay Hinsey referred E.L.'s case to MLS Group of Companies, LLC

17  for a physician review of the claim. *See* AR 1085. Dr. Mostafa Farache, M.D., reviewed the claim

18  and completed a report on March 5, 2021. *See id.* at 1085–1091. Dr. Farache is board certified by

19  the American Board of Neurology and Psychiatry and the American Board of Neurophysiology

20  and provided "a review from a neurological perspective." *Id.* at 1086, 1090. Dr. Farache's report

21  listed E.L.'s physical demand rating as "[s]edentary" and her diagnosis as only "M50.022 –

22  cervical disc disorder at C5-C6 level with myelopathy." *Id.* at 1085 (emphasis removed). Dr. Brian

23  Lee was the only doctor listed under provider contact information. *Id.* The report indicates that Dr.

24  Farache was unsuccessful in reaching Dr. Lee by phone. *See id.* at 1088. On both February 25,

25  2021 and March 1, 2021, Dr. Farache reports that he spoke to a receptionist, leaving a message

26  and call back number. *Id.*

27       Dr. Farache concluded that "[d]ue to the nature of the claimant's surgery and need for

28  recovery," "impairment … is supported" from November 23, 2020 to January 4, 2021. *Id.* at 1089.

United States District Court
Northern District of California

He concluded that no other restrictions and limitations are supported outside of that timeframe. *Id.*

Based on Dr. Lee's opinion that "the neurological exam showed discordance between direct and indirect examination, and that the claimant did not have any neurological localizing lesion to explain her symptoms," and that the "MRI brain did not show any findings that could explain the claimant's reports of dizziness/imbalance complaints," Dr. Farache concluded that "[t]hese findings suggest that the claimant was manufacturing her findings." *Id.* at 1089. He asserted that "[t]here was insufficient objective evidence to validate the claimant's complaints of dizziness/imbalance, weakness and paresthesia" and that E.L.'s "headaches were not of severity to substantiate work preclusion." *Id.* He noted that "it would be reasonable for the claimant to miss work on the days in which her headache would require the need for emergency room services." *Id.*[4]

---

[4] Dr. Farache was asked to answer the question: "Based on your review of the provided medical documentation, is there clinical evidence to support functional impairment from 8/17/20 to the present and beyond?" His response in full was:

> The claimant underwent a transsphenoidal resection of the pituitary macroadenoma with uncomplicated post operative course on 11/23/2020. Due to the nature of the surgery and need for recovery, off work restrictions from 11/23/2020 to 1/4/2021 would be supported. No other restrictions and limitations are supported outside of 11/23/2020 to 1/4/2021. On 1/4/2021, the claimant was seen by Dr. Brian Lee who noted that the claimant was 6 weeks post op. He noted that the claimant complained of frontal headache. He noted that the claimant complained of weakness in all extremities with standing up to walk. He noted that the claimant complained of burning pain in the hands and feet. On 2/9/2021, he noted that the claimant complained of burning paresthesia in the hands and feet, that the tilts to the side she looks at, that the claimant complained of her balance being off, that the neurological exam showed discordance between direct and indirect examination, and that the claimant did not have any neurological localizing lesion to explain her symptoms. These findings suggest that the claimant was manufacturing her findings. The MRI brain did not show any findings that could explain the claimant's reports of dizziness/imbalance complaints. There was insufficient objective evidence to validate the claimant's complaints of dizziness/imbalance, weakness and paresthesia. The claimant's headaches were not of a severity to substantiate work preclusion. However, it would be reasonable for the claimant to miss work on the days in which her headache would require the need for emergency room services.

AR 1089.

Dr. Farache acknowledged that E.L.'s "reported complaints are consistent." *Id.* at 1089. His core reason for declining to find limitations and restrictions was "insufficient medical evidence such as examination findings, diagnostic testing, and etcetera to correlate with the claimant's complaints. … [T]here are no supported restrictions and limitations outside of the time in which the claimant was [in] recovery from surgery." *Id.* "As the claimant has no objective findings on exam or imaging to explain the claimant's complaints and this is thought to be psychogenic," Dr. Farache wrote, "then a good prognosis is expected from [a] neurological perspective." *Id.* at 1090.

In a March 19, 2021 letter, Hartford's Kay Hinsey notified E.L. that Hartford was "in the process of reviewing" the appeal but was not yet ready to make a decision. *See id.* at 1325–26. Along with that letter, Hartford provided E.L. with a copy of Dr. Farache's review. *See id.* at 1326. The letter also notified E.L. that she had "21 days from the date of this letter or until April 8, 2021 to look over that information and decide if you want to respond" and provide Hartford with "anything else we should review." *Id.*

### 2.    Physician Review Report Addendum – April 15, 2021

Dr. Farache completed an addendum on April 15, 2021. *See* AR 1365–71. Hartford had asked Dr. Farache "to comment further on the physical therapy notes from 6/1/2020 – 2/21/2021 and progress notes from Dr. Lee at least from 7/31/2020 – 2/9/2021 and explain in detail how these findings in these notes do not support an impairment from 8/17/2020 – 11/2020, and from 1/5/2021 to present." *Id.* at 1370. He concluded:

> Regarding the physical therapy notes, findings mentioned in the physical therapy notes have no value if the neurological exam done by [the] physician does not duplicate these findings. In regards to progress notes from Dr. Lee, on 11/2/2020, there was a history and physical documentation in which the neurological exam was normal and the abnormalities noted on [the] exam were related to acromegaly and not to any neurological deficits. On 2/9/21. Dr. Brian Lee documented that there was discordance between direct and indirect examination which means that the claimant was manufacturing findings on the neurological exam and that suggests that her neurological symptoms are also the product of a non-organic cause. Based on the prior discussion, there are no documented deficits or abnormality on the neurological exam to support impairment for the time periods in question (outside of the dates in which impairment

was previous[ly] supported) from [a] neurological perspective in this claimant[‘s] case.

*Id.*

In a letter dated April 20, 2021, Hartford's Kay Hinsey notified E.L. that Hartford was still "in the process of reviewing" the appeal and was not yet ready to make a decision. *See id.* at 1362. The letter said that it included a copy of Dr. Farache's report and noted that there were "clarifications outlined on pages 8 through 9." *Id.* The letter also notified E.L. that she had "21 days from the date of this letter or until **May 10, 2021** to look over that information and decide if you want to respond" and provide Hartford with "anything else we should review." *Id.*

### 3.    Physician Review Report Addendum – May 3, 2021

Hartford sent additional records to Dr. Farache, who completed another addendum dated May 3, 2021. *See* AR 1233–38. Those records included E.L.'s lumbar MRIs and progress notes from Dr. Lee, Dr. Hwang, Dr. Ngo, Dr. Gutta, Dr. Tasch, and Dr. Foy. *Id.* at 1234–35. Dr. Farache concluded that "all the providers who evaluated the claimant in the new records provided agreed that she does not have any organic cause of her complaints and that malingering and conversion reaction was the cause of her symptoms." *Id.* at 1236. He now opined that E.L.'s "reported complaints are *not* consistent through the medical data from her treating providers." *Id.* (emphasis added). He elaborated: "There is no medical evidence such as examination findings, diagnostic testing, etcetera to correlate with the claimant's complaints. The claimant[‘s] neurological exams were unremarkable except for findings related to her malingering (manufacturing her own findings) and symptoms are not supported by findings on exams. Exams do prove that the claimant[‘s] complaints are psychogenic or related to malingering." *Id.* at 1237. He concluded that E.L. has "[n]o disabling condition" because she "had … Neurology and Ophthalmology evaluations (which found no reason for her symptoms) which is appropriate. … Malingering and conversion disorder prognosis should be good as the claimant does not have any neurological deficit." *Id.*

In a letter dated May 6, 2021, Hartford's Kay Hinsey notified E.L. that Hartford was still "in the process of reviewing" the appeal and was not yet ready to make a decision. *See id.* at 1372–73. The letter included a copy of Dr. Farache's May 3, 2021 addendum. *See id.* at 1373. The

letter itself also listed the additional information that Hartford received and Dr. Farache reviewed in his latest addendum. *Id*. Hartford once again invited E.L. to comment within 21 days or by May 26, 2021. *Id*.

### F.    Final Denial of E.L.'s Administrative Appeal

On May 28, 2021, Hartford provided E.L. with a final claim determination "agree[ing] with the original decision to deny [her] benefit as of August 17, 2020." *See id.* at 1420–24. The letter concluded that E.L.'s "request for LTD benefits was denied, effective August 17, 2020 due to a lack of medical evidence to support a functional impairment, which precluded you from performing the material duties of your own occupation." *Id.* at 1421. The letter noted that "there is support for functional impairment from November 23, 2020 to January 4, 2021, due to the nature of … surgery on November 23, 2020" but that "[n]o restrictions are supported outside this period." *Id.* at 1422. The denial letter relied heavily on Dr. Farache's findings. For example, the letter stated: "More recent documentation from the providers who evaluated you opines there is not any organic cause of your complaints and that malingering and conversion reaction was the cause of your symptoms. Your reported complaints are not consistent through the medical data from … treating providers. There is no medical evidence such as examination findings, diagnostic testing to correlate with your complaints." *Id.*

The letter concludes: "Therefore, based on our review of the aforementioned information detailed herein, we are not able to recommend LTD benefit payment from November 23, 2020 onward as the period being addressed is as of August 17, 2020. There is no indication you returned to work [after] the denial of LTD benefits and went out again. The provided medical records lacked clinical evidence to suggest you would not have been able to perform the material duties of your own occupation prior to undergoing surgery on November 23, 2020. As you were not found to be continuously disabled, LTD benefits are not payable for the period beginning November 23, 2020. As such the original determination to deny LTD benefits remains upheld, effective August 17, 2020." *Id.* at 1423.

On September 23, 21, E.L. called Hartford and left a voicemail inquiring about re-opening her claim. *Id.* at 1474. On October 4, 2021, E.L. attempted to reopen the appeal by sending a letter

to Hartford documenting her ongoing symptoms. *Id.* at 700. Later that month, Kay Hinsey spoke

to E.L. and informed her that there is only one level of appeal. *Id.* at 1474. On November 2, 2021,

E.L. sent an email notifying Hartford that she was collecting social security disability benefits and

asking again to reopen her claim. *Id.*

## CONCLUSIONS OF LAW

The parties seek opposing judgments: E.L. requests that this Court (1) admit extra record

evidence, (2) award benefits with prejudgment interest through August 17, 2022, (3) remand the

matter back to Hartford for a determination of E.L.'s entitlement to "any occupation" benefits

under the Policy; and (4) award attorneys fees and costs. *See* Dkt. No. 31, at 29. Additionally, "to

remedy Hartford's breaches of duty," E.L. seeks "an Order providing that as part of any future

decisions concerning [E.L.'s] claim for 'any occupation' benefits," Hartford "(1) provide

unredacted copies of its guidelines, policies, and procedures; (2) is precluded from relying upon

Ms. Bergner's and Dr. Farache's medical opinions and reports in future claims decisions

concerning [E.L.]'s claims for benefits, (3) limited to applying only those terms and conditions set

forth in the Policy; and (4) is precluded from using any non-Policy terms, conditions, and

standards used to date, including the requirement that disability be supported by 'objective'

evidence or have an 'organic cause.'" *Id.* Hartford requests a judgment in its favor upholding its

decision to deny E.L.'s LTD benefits. *See* Dkt. No. 34, at 31.

"ERISA was enacted 'to promote the interests of employees and their beneficiaries in

employee benefit plans,' and 'to protect contractually defined benefits.'" *Firestone Tire & Rubber

Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations omitted). ERISA "permits a person

denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro.

Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "ERISA's civil-enforcement provision … allows

a claimant 'to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Muniz

v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) (quoting 29 U.S.C.

§ 1132(a)(1)(B)).

"A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo

1    standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

2    determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115.

3    The parties agree that de novo review is appropriate here. *See* Dkt. No. 31, at 19; Dkt. No. 34, at

4    21. Under de novo review, "the court simply proceeds to evaluate whether the plan administrator

5    correctly or incorrectly denied benefits," with no deference given to the administrator's decision.

6    *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc). "The district

7    court's task is to determine whether the plan administrator's decision is supported by the record,

8    not to engage in a new determination of whether the claimant is disabled. Accordingly, the district

9    court must examine only the rationales the plan administrator relied on in denying benefits and

10   cannot adopt new rationales that the claimant had no opportunity to respond to during the

11   administrative process." *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th

12   Cir. 2022). "[W]hen the court reviews a plan administrator's decision under the de novo standard

13   of review, the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294.

14          **A.    The Court Denies E.L.'s Request to Admit Extrinsic Evidence to the
                    Administrative Record.**

15

16          E.L. seeks to admit three categories of evidence from outside of the administrative record.

17   First, E.L. seeks to admit an incomplete copy of her Social Security File and SSDI Notice of

18   Award issued after the final denial of her LTD claim. Second, E.L. seeks to admit a letter

19   explaining steps she took to obtain the complete SSDI file. Third, E.L. seeks to admit medical

20   literature, including excerpts from the DSM-5 explaining relevant medical conditions and

21   diagnoses.

22          The Ninth Circuit has held that when courts review a plan administrator's decision de

23   novo, "extrinsic evidence [can] be considered only under certain limited circumstances." *Opeta v.*

24   *Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (citing

25   *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943–44 (9th Cir.

26   1995)). In most cases, "only the evidence that was before the plan administrator at the time of

27   determination should be considered." *Id.* District courts "should not take additional evidence

28   merely because someone at a later time comes up with new evidence that was not presented to the

United States District Court
Northern District of California

plan administrator." *Mongeluzo*, 46 F.3d at 944. "[W]here the original hearing was conducted under a misconception of the law," however, "it is necessary for the case to be reevaluated in light of the proper legal definitions." *Id.*

E.L. seeks to have the SSDI award and file admitted because these documents had not yet been available when Hartford issued its final adverse denial. She argues that the file and medical literature, including excerpts from the DSM-5, "are also properly admitted because the Court cannot conduct a proper *de novo* review of the claim without fully understanding the significance of the medical evidence." Dkt. No. 31, at 18. E.L. argues that the medical literature in particular "provide[s] explanations of [her] complex medical conditions, as it is apparent from Hartford's final appeal denial letter that it and its medical reviewers did not understand (or failed to investigate) the complexity of her conditions and significance of the medical evidence." *Id.* She specifically refers to Hartford's "treating malingering and conversion disorder as one condition" despite the two being "mutually exclusive." *Id.* Finally, E.L. argues that these documents "are also properly admitted to cure Hartford's procedural irregularities," including Hartford's change in reason for denying benefits without providing E.L. with an opportunity to comment on that changed reasoning. *Id.* at 19.

In response, Hartford first refutes E.L.'s contention that it and its medical reviewers failed to distinguish between malingering and conversion disorder. Hartford contends that Dr. Farache is a board-certified neurologist and psychiatrist and adequately "distinguished between the two throughout his reviews." Dkt. No. 34, at 29–30 (citing AR 1237). Next, Hartford argues that the SSDI award should not be admitted because the "incomplete SSDI file would inhibit the Court's ability to assess Hartford's determination because there is no telling upon what basis the SSA approved benefits." *Id.* at 30 (citing *Houghton v. Hartford Life & Accident Ins. Co.*, No. C16-1186RAJ, 2017 WL 3839577, at *7 (W.D. Wash. Aug. 31, 2017)). Third, Hartford argues that "the Administrative Record is over 1700 pages containing medical evidence from 11 different providers and three independent reports," thereby providing "ample record proof from which" the court "can adequately review [the administrator's] decision." *Id.* (quoting *Nguyen v. Sun Life Assurance Co. of Can.*, No. 314CV05295JSTLB, 2015 WL 6459689, at *5 (N.D. Cal. Oct. 27,

United States District Court
Northern District of California

1   2015)). "If Plaintiff's condition remains unexplained," Hartford argues, "it is because Plaintiff

2   failed to meet her burden." *Id.* Last, Hartford refutes E.L.'s argument that she lacked the

3   opportunity to comment on new reasoning. *Id.* at 30–31. Specifically, Hartford emphasizes that

4   "Dr. Farache's review and addendums contained the exact language Plaintiff now claims she did

5   not have the opportunity to comment on," and Hartford "sent Plaintiff Dr. Farache's initial review

6   (1326), his April 14, 2021 addendum (1362), and his May 3, 2021 addendum (1373). She chose

7   not to respond each time." *Id.* at 31.

8          The Court concludes that the circumstances here do not "clearly establish that additional

9   evidence is necessary to conduct an adequate de novo review" in this case. *Opeta*, 484 F.3d at

10  1217 (cleaned up). E.L. is correct that the SSDI award was not available when Hartford issued its

11  adverse denial, and courts have at times admitted SSDI records available only after the denial of a

12  claimant's LTD claim where that decision helped the court evaluate the impact of the claimant's

13  limitations on their ability to work. *See, e.g., Oldoerp v. Wells Fargo & Co. Long Term Disability

14  Plan*, No. C 08-05278 RS, 2013 WL 6000587, at *2 (N.D. Cal. Nov. 12, 2013); *Schramm v. CNA

15  Fin. Corp. Insured Grp. Benefit Program*, 718 F. Supp. 2d 1151, 1165 & n.4 (N.D. Cal. 2010).

16  Given the incomplete record from the Social Security Administration, however, the records E.L.

17  seeks to have added to the record are less likely to aid the Court's analysis in this case than the

18  records admitted in those prior matters. More importantly, however, the administrative record is

19  extensive and the Court has adequate information to evaluate the credibility and strength of

20  evidence contained therein.

21         As discussed further below, the Court also disagrees that Hartford's procedural

22  irregularities deprived E.L. of a full and fair review in a manner that might provide independent

23  grounds to admit this evidence.

24         While the Court declines to admit E.L.'s extrinsic evidence, it will take judicial notice of

25  the fact that Functional Neurological Symptom Disorder/Conversion Disorder is a mental disorder

26  listed in the American Psychiatric Association's Diagnostic Statistical Manual of Mental

27  Disorders. Judicial notice of this fact is appropriate both because the Plan incorporates the

28  American Psychiatric Association's Diagnostic Statistical Manual by reference in its definition of

1    "Mental Illness," *see* AR 1665, and because the contents of the DSM can be accurately and readily

2    determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201.

3       **B.    E.L. Is Entitled to Own Occupation Benefits Under the Plan.**

4        To meet her burden under the Plan, E.L. must establish that she has a disability or is

5    disabled, defined as being "prevented from performing one or more of the "[e]ssential [d]uties of

6    … [her] [o]ccupation."AR 1664. Pursuant to the Plan, E.L. must demonstrate that her disability

7    resulted from one of five causes: (1) "accidental bodily injury;" (2) "sickness;" (3) "Mental

8    Illness;" (4) "Substance Abuse;" or (5) "pregnancy." *Id.* Of those five causes, the Policy defines

9    only two: "Mental Illness" and "Substance Abuse." The Plan defines "Mental Illness" as "a mental

10   disorder as listed in the current version of the Diagnostic and Statistical Manual of Mental

11   Disorders, published by the American Psychiatric Association." *Id.* at 1665.[5] Under the Plan, a

12   "Mental Illness may be caused by biological factors or result in physical symptoms or

13   manifestations." *Id.*

14       E.L. has met her burden of demonstrating that she was unable to perform essential duties

15   as defined under the Plan. The Plan defines "Essential Duty" as a duty that is (1) "substantial, not

16   incidental," (2) "fundamental or inherent to the occupation;" and (3) "cannot be reasonably

17   omitted or changed." *Id.* at 1664. The Plan explicitly states that a claimant's "ability to work the

18   number of hours" in their "regularly scheduled workweek is an Essential Duty." *Id.* E.L.'s

19   employer directly indicated that "seated work" and "reduced hours" were incompatible with E.L.

20   performing the duties of her own occupation. *See, e.g.*, *id.* at 287, 355, 600. As a result, those are

21   duties that "cannot be reasonably omitted or changed." E.L.'s functional disability must be

22   evaluated with that in mind.

23       The Court further finds and concludes that the weight of the medical evidence from

24   providers who examined and treated E.L. over time demonstrates that E.L. suffered from a

25

26   _____

27   [5] Excluded from the definition of mental illness under the Policy are the following six disorders
     outlined in the Diagnostic and Statistical Manual: (1) "Mental Retardation;" (2) "Pervasive
     Developmental Disorders;" (3) "Motor Skills Disorder"; (4) "Substance-Related Disorders;" (5)
28   Delirium, Dementia, and Amnesic and Other Cognitive Disorders;" and (6) "Narcolepsy and Sleep
     Disorders related to a General Medical Condition." AR 1665.

complex but consistent array of physical and psychological symptoms that continued to prevent her from performing her non-sedentary occupation after August 16, 2020. Medical records from E.L.'s treating doctors and physical therapist indicate that E.L.'s "cervical disc herniation with myelopathy" impaired her ability to engage in "all activities with neck flexion, extension, or rotation" and put her at risk of "loss of balance." *See id.* at 101–03. Based on these symptoms, Dr. Lee made a surgical referral, *id.* at 115, physical therapy referral, *id.* at 119, and ongoing recommendations that E.L. remain off work due to ongoing symptoms, *see*, *e.g.*, *id.* at 102, 158, 163, 394, 405, 790. A physical treatment protocol was established for E.L. in May 2020 with treatment goals related to E.L. being able to "stand without feeling of being unbalanced" and gain relief from cervical symptoms that impacted her ability to turn her neck and raise her arms overhead, for example. *Id.* at 120, 121, 124. Hartford's own notes in mid-August 2020 indicate that, based on medical records, E.L. remained "unable to perform normal job demands while recovering" and therefore "[i]mpairment remained supported thru eob 8/16 beyond odg guidelines." *Id.* at 287. Hartford had approved short-term disability benefits based on these impairments and was aware at that time that E.L.'s job could not accommodate seated work and could not accommodate reduced hours. *See id.* at 287, 600.

By August 31, 2020, E.L. had only met one of three treatment goals. *See id.* at 796–98. She was able to turn her head without symptoms and made progress in standing without feeling unbalanced. *Id.* at 798. This evidence suggests that the treatment protocols were helping, as her providers reported, but that E.L. continued to exhibit impairing symptoms including an ongoing risk of falling while bending and "back pain and hand weakness, particularly [on the] left side." *See id.* at 790–91. Based on these ongoing symptoms, Dr. Lee continued to opine on August 31, 2020 that E.L. needed ongoing physical therapy and would not be ready to return to work for at least a few more months. *Id.* at 790, 803.

During that time, E.L. was also exhibiting ongoing symptoms related to "[p]ituitary macroadenoma causing acromegaly" presenting with "classic symptoms of head and foot enlargement, sleep apnea, carpal tunnel syndrome, and dental malocclusion." *Id.* at 850–51. An MRI conducted in November 2020 showed that E.L. had a mass that "appears larger than on prior

imaging." *Id.* at 855, 972. Dr. Efron opined that worsening symptoms were a risk of not proceeding with surgery. *Id.* at 855. Dr. Efron also documented that E.L., while she was "in full remission for major depressive disorder, recurrent episode," continued to be treated with Cymbalta. *Id.* at 851. At that time, E.L. was also being treated with Glucophage and Insulin for other conditions. *Id.* In early November, E.L. continued to make progress in physical therapy, but still had not met two of three treatment goals, *see id.* at 937–38, prior to undergoing the craniotomy transsphenoidal microscopic tumor excision on November 23, 2020, *id.* at 899–900.

Hartford concedes that "there is support for functional impairment from November 23, 2020 to January 4, 2021, due to the nature of … surgery on November 23, 2020, which included a transsphenoidal resection of the pituitary macroadenoma with uncomplicated post operation course." *Id.* at 1422.

Records after that time suggest that E.L. continued to exhibit similar and worsening symptoms post-surgery. E.L.'s physical therapist assessed that E.L. "ha[d] increased muscle weakness s/p surgery." *Id.* at 948. E.L. had appointments with Dr. Ngo, Dr. Lee, Dr. Hwang, Dr. Gutta, and Dr. Tasch for ongoing symptoms of dizziness and falling.

While Dr. Ngo identified "[n]o acute ocular findings to account for symptoms of disequilibrium," she "quer[ied] if better MRI imaging … would be worthwhile to further evaluate any pathology consistent with" the symptoms. *Id.* at 978. She made a referral to Dr. Hwang and recommended follow-ups with other providers. *Id.* She did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms.

While Dr. Lee identified "no additional neurologic disorder at this time," "no single localization within the neuraxis that will produce E.L.'s current constellation of symptoms," and a "discordance between direct and indirect examination," *id.* at 705–06, he did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms. *See also id.* at 1101–02. Rather, as Dr. Lee discussed with Dr. Gutta, he simply opined that the "etiology is unclear" and not likely to be a "neurologic issue." *Id.* at 713–15.

While Dr. Hwang identified "no clear vestibular or ocular misalignment findings on exam" and "no detectable optic nerve damage," he recommended "updated refraction given her

35

ani[s]ometropia and hyperopia" to help "her eyes relax." *Id.* at 733. Dr. Hwang did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms.

After E.L. "got up from her chair, ran across the room and hit her head on the floor" during a March 2021 appointment with Dr. Gutta, Dr. Gutta referred E.L. to the emergency department and noted that there continued to be no "neurologic focus for her symptoms" and queried whether "?conversion disorder v. malingering" might explain some of these symptoms. *See id.* at 721. Again, Dr. Gutta did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms. In an April follow-up visit, Dr. Gutta opined that "conversion disorder" might explain the symptoms and recommended a "follow up with psych." *Id.* at 719. Dr. Gutta did not mention "malingering" in that progress note. *Id.*

While Dr. Tasch identified no neurological origin for E.L.'s symptoms in March 2021, after noting that E.L.'s growth factor hormones remain elevated, he opined that "she has subclinical functional neurologic disorder/conversion disorder which may be a combination of subjective symptoms from her hormonal fluctuations in combination with psychological stress.*"* *Id*. at 709. Again, Dr. Tasch did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms. Rather, after a May follow-up visit, Dr. Tasch "continue[d] to be of the opinion that these symptoms [of exhibited balance difficulties and jerks] represent a form of conversion disorder." *Id.* at 712. Elevated growth hormone levels combined with stress are possible causes of these somatic symptoms, as he noted in March.

Other providers continued to treat E.L. for additional symptoms. Dr. Kahn diagnosed E.L. with "[a]cromegaly with residual disease after debulking" for weight gain, muscle thickness, and burning in her hands and feet caused by clinically-indicated elevated growth hormone levels. *Id.* at 1206, 1208. Dr. Kahn prescribed E.L. octreotide and recommended "starting medical treatment now" for her presentation of symptoms. *Id.* Like other physicians, Dr. Kahn did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms.

United States District Court
Northern District of California

1    E.L. had a psychiatry appointment with Dr. Venkataraman in May 2021. The notes do not

2    demonstrate whether Dr. Venkataraman evaluated E.L. for conversion disorder. Nonetheless, Dr.

3    Venkataraman did not affirmatively rule that out and instead diagnosed E.L. with "major

4    depressive disorder current mild … due to feeling physically unwell." *Id.* at 686. She provided

5    E.L. with two weeks off work on the basis of that diagnosis and increased E.L.'s medication to

6    treat the increase in symptoms. *Id.* Dr. Venkataraman did not conclude that there was no cause for

7    E.L.'s symptoms, nor that E.L. was simply fabricating or manufacturing these symptoms.

8    Dr. Chang evaluated E.L. for a head and neck surgery follow-up. While he ruled out

9    "BPVV, Meniere's disease, labyrinthitis, [and] SSCD," based on her symptoms, Dr. Chang did not

10   rule out "vestibular migraine as a possible etiology although her history of transsphenoidal surgery

11   and pituitary adenoma may [be] contributing to some of her migrainous symptoms …" *Id.* at

12   1200. He therefore recommended that E.L. continue with "Flonase and nasal saline irrigations."

13   *Id.* Dr. Chang did not conclude that there was no cause for E.L.'s symptoms, nor that E.L. was

14   simply fabricating or manufacturing these symptoms.

15   E.L. also underwent two MRIs in March 2021. The first showed relevant findings

16   including, for example, "moderate-severe degenerative disc disease," "severe compression of the

17   S1 nerve in the lateral recess," "[l]ower thoracic disc desiccation and annulus bulging and

18   arthropathy right side greater than left," and "moderate to severe right T12-L1 and T11-12

19   foraminal stenosis." *Id.* at 1128. The second MRI included relevant findings, including, for

20   example, that E.L.'s "sella is enlarged and very distorted," "postoperative changes in the sella,"

21   "loss of curvature and straightening of the spine," and "[b]ilateral thyroid lesions" with the

22   "largest mass … in the left lobe measuring over 4 cm." *Id.* at 1129–31. The reviewing physician

23   recommended an ultrasound. *Id.* These findings are not indicative of a lack of cause for E.L.'s

24   symptoms, nor would they support the conclusion that E.L. was simply fabricating or

25   manufacturing these symptoms.

26   Based on these records and her ongoing and worsening symptoms, E.L. has established by

27   a preponderance of the evidence that she has been continuously disabled under the Plan. She has

28   experienced persistent neck and back pain, dizziness, headaches, weakness, burning in and

37

United States District Court
Northern District of California

enlargement of her hands and feet, anxiety, depression, and related somatic symptoms likely caused by a combination of cervical disc herniation, myelopathy, and degenerative disc disease with clinically supported MRI evidence, pituitary macroadenoma causing acromegaly and acromegaly with residual disease after the removal of a tumor, and clinically indicated ongoing elevated levels of IGF-1 hormones even months after surgery. She has also suffered from mental disorders listed in the DSM including Major Depressive Disorder, Recurrent Episode, Generalized Anxiety Disorder, and Conversion Disorder. The combined effect of these symptoms created a functional impairment that prevented her from fulfilling the essential duties of her occupation.

Hartford's arguments to the contrary are unavailing. First, Hartford contends that E.L. relied solely on her own subjective evidence to meet her burden. In so arguing, Hartford posits that E.L. fabricated her symptoms, which are either unsupported or disproven by the record. *See* Dkt. No. 34, at 22–25. That is factually incorrect, as E.L.'s medical file includes objective observations, assessments by treating professionals, and evaluations including several MRIs. While there is evidence that E.L. was not totally impaired in every area of her life—being able to walk, drive, perform her physical therapy exercises well, and showing improvement in some areas, for example—these facts do not prove that E.L. is not credible nor negate otherwise compelling medical records indicating symptoms that impaired her ability to work a full-time non-sedentary job—symptoms that Hartford identified as sufficient to keep her out of work through August 16, 2020. Considering both E.L.'s subjective assessment of her symptoms and these clinical diagnoses, test results, and evaluations of symptoms that would be otherwise indicated, E.L. has met her burden.

Next, Hartford argues that none of E.L.'s treating physicians presented evidence sufficient to prove disability. Hartford points to E.L.'s noted improvement in physical therapy, Dr. Lee's lack of explanation in the work status reports, and the virtual nature of E.L.'s appointments with Dr. Lee in 2020 as evidence that E.L.'s treating providers had insufficient evidence to identify a functional limitation. The Court again disagrees. A complete and wholistic review of E.L.'s medical records paints a picture of a woman with a lengthy and complex medical history. E.L. followed the recommendations—at times with hesitation—as her doctors attempted to rule out

possible diagnoses and identify the causes of a diverse array of symptoms that required surgery

and treatment by medication. None of her treating physicians concluded that E.L. simply

fabricated her presenting symptoms. That specialists ruled out possible causes or failed to identify

a single cause is not proof that E.L. was not functionally disabled.

Taking into account the essential duties of her occupation, including the requirement that

she perform non-seated work on a non-reduced work schedule, E.L. has demonstrated by a

preponderance of the evidence that she was disabled effective August 17, 2020. Accordingly,

Hartford's rationale for denying the LTD benefits to E.L. is not supported by the record. *See*

*Abatie*, 458 F.3d at 963. To the contrary, on the basis of the record before Hartford, E.L. was

entitled to those benefits under the terms of the Plan.

### C.   Hartford Provided E.L. with a Full and Fair Review.

Contrary to E.L.'s arguments, Hartford provided E.L. with a full and fair review in this

case. The Plan entitles Hartford to "any and all medical information, including x-ray films and

photocopies of medical records, including histories," in order to evaluate a claim. AR 1659.

Hartford afforded E.L. multiple opportunities to review and respond to all relevant information,

including the reports of Dr. Farache concluding that she was not disabled. *See id*. at 1325–26

(providing E.L. 21 days to respond to Dr. Farache's March 5, 2021 letter); *id*. at 1362 (providing

E.L. 21 days to respond to Dr. Farache's April 15, 2021 addendum)*; id*. at 1372–73 (providing

E.L. 21 days to respond to Dr. Farache's May 6, 2021 addendum report). Although Hartford's

final determination relied heavily on those reports, Hartford provided E.L. with an opportunity to

respond to each report and to provide additional records in support of her claim.

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011), is

inapposite. In that case, the Ninth Circuit held that:

> the plan abused its discretion [where its] decision was illogical,
> implausible, and without support in inferences that could reasonably
> drawn from the facts in the record because (1) every doctor who
> personally examined Salomaa concluded that he was disabled; (2) the
> plan administrator demanded objective tests to establish the existence
> of a condition for which there are no objective tests; (3) the
> administrator failed to consider the Social Security disability award;
> (4) the reasons for denial shifted as they were refuted, were largely
> unsupported by the medical file, and only the denial stayed constant;

United States District Court
Northern District of California

and (5) the plan administrator failed to engage in the required 'meaningful dialogue' with Salomaa.

642 F.3d at 676. The Court concluded that the plaintiff had been denied a full and fair review where the plan demanded objective medical evidence of a condition for which "[t]here is no blood test or other objective laboratory test," *id.* at 677, and that the "plan also failed to conform to the claims procedure required by statute and regulation" because "the plan did not give Salomaa and his attorney and physicians access to the two medical reports of its own physicians upon which it relied" and "denied the claim largely on account of absence of objective medical evidence, yet failed to tell Salomaa what medical evidence it wanted," *id.* at 679. The Court explained that "where the denials [are] based on absence of some sort of medical evidence or explanation … the administrator [is] obligated to say in plain language what additional evidence it needed and what questions it needed answered in time so that the additional material could be provided." *Id.* at 680.

The facts here are significantly different. Unlike the plaintiff in *Salomaa*, E.L.'s diagnosis was not clear, and some of the possible diagnoses could be made through objective medical evidence. Further, Hartford's final denial letter reflected in plain language the reasons for its denial, based largely on Dr. Farache's reports, and E.L. was provided with those reports and an opportunity respond.

Ultimately, the plan administrator's errors here were substantive, not procedural. The Court therefore finds no denial of E.L.'s right to a full and fair review of her claim.

### D.     E.L.'s Motion To Strike is Denied.

E.L. moves this Court to strike the Declaration of John W. Fogarty, Dkt. No. 34-5 and accompanying Exhibit 1, Chronology of Medical Evidence, Dkt. No. 34-6. Federal Rule of Evidence 1006 provides, however, that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recording, or photographs that cannot be conveniently examined in court." The Chart summarizes records totaling over 1700 pages and can be admitted by declaration pursuant to Rule 1006.

**CONCLUSION**

For the foregoing reasons, E.L.'s motion for judgment is granted in part, Hartford's motion for judgment is denied, and E.L.'s motion to strike is denied. E.L. shall provide a proposed form of judgment to Hartford within five business days of the date of this order. Within five business days thereafter, Hartford shall either sign the proposed judgment, indicating its agreement only as to form, or provide written objections to the form of judgment. Within five business days of receiving Hartford's response, E.L. shall file either (1) an approved form of judgment or (2) a proposed from of judgment, a copy of Hartford's objections, and a written response to the objections. The objections and response may not exceed three pages each.

**IT IS SO ORDERED.**

Dated: March 27, 2024

_____
P. Casey Pitts
United States District Judge